In the United States District Court
for the Northern District of Illinois
Eastern Division

| | |
|---|---|
| Samantha Young, | |
| *On behalf of themselves and others similarly situated*, | Case No. |
| Plaintiffs, | Judge |
| v. | Magistrate Judge |
| Rolling in the Dough, Inc.; Rolling in the Dough II, Inc.; JWG Enterprises, LLC; Domino's Pizza, Inc.; Domino's Pizza Franchising, LLC; Domino's Pizza, LLC; Kenneth Lindeman; John W. Groll III; | Jury Demand Endorsed Hereon |
| Defendants. | |

## Class and Collective Action Complaint

1.      Samantha Young, on behalf of herself and all similarly-situated individuals, brings this action against Defendants Rolling in the Dough, Inc.; Rolling in the Dough II, Inc.; JWG Enterprises, LLC; Domino's Pizza, Inc.; Domino's Pizza Franchising, LLC; Domino's Pizza, LLC; Kenneth Lindeman; and John W. Groll III. Plaintiff seeks appropriate monetary, declaratory, and equitable relief based on Defendants' willful failure to compensate Plaintiff and similarly-situated individuals with minimum wages as required by the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* ("IMWL"), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.* ("IWPCA").

2.     According to its 2016 Annual Report, Domino's Pizza, Inc., Domino's Pizza, LLC, and Domino's Pizza Franchising, LLC (collectively, "Domino's") comprise the second largest pizza company in the world, and the number one pizza delivery chain in the United States, holding approximately 28% of the total market share for pizza delivery.

3.     In 2016, Domino's restaurants grossed $10,000,000,000.00 on delivery sales.

4.     In 2016, ninety-three percent (4,979 out of 5,371) of Domino's restaurants nationwide were owned by franchisees.

5.     JWG Enterprises, LLC ("JWG"), owned and operated by John W. Groll III, is one of Domino's franchisees.

6.     Rolling in the Dough, Inc. and Rolling in the Dough II, Inc. ("Rolling in the Dough"), owned and operated by Kenneth Lindeman, also comprise one of Domino's franchisees.

7.     Plaintiff worked for JWG in Lisle, Illinois from March to July 2017.

8.     Plaintiff worked for Rolling in the Dough in Willowbrook, Illinois in July 2017.

9.     Plaintiff and similarly situated delivery drivers at franchise stores such as JWG and Rolling in the Dough are the lynchpin of Domino's' entire organization. Their work is essential to Domino's' cause.

10.     Domino's, JWG, and Groll jointly employed Plaintiff and similarly-situated delivery drivers at JWG at all times relevant.

11.     Domino's, Rolling in the Dough, and Lindeman jointly employed Plaintiff and similarly-situated delivery drivers at JWG at all times relevant.

2

12.    Defendants repeatedly and willfully violated the Fair Labor Standards Act, the IMWL, and the IWPCA, by improperly taking a tip credit from the wages of delivery drivers, and by failing to adequately reimburse delivery drivers for their delivery-related expenses, and thereby failing to pay delivery drivers the legally mandated minimum wage for all hours worked.

13.    Defendants maintain a policy and practice of underpaying their delivery drivers in violation of the FLSA, the IMWL, and the IWPCA.

14.    All delivery drivers at JWG, including Plaintiff, have been subject to the same employment policies and practices, including policies and practices with respect to wages, reimbursement for out-of-pocket expenses, and wage deductions.

15.    All delivery drivers at Rolling in the Dough, including Plaintiff, have been subject to the same employment policies and practices, including policies and practices with respect to wages, the tip credit, reimbursement for out-of-pocket expenses, and wage deductions.

16.    Plaintiff brings this action on behalf of herself and similarly situated current and former delivery drivers who elect to opt in pursuant to FLSA, 29 U.S.C. § 216(b) to remedy violations of the FLSA wage and hour provisions by Defendants.

17.    Plaintiff also brings this action on behalf of herself and similarly situated current and former delivery drivers in Illinois, pursuant to Federal Rule of Civil Procedure 23, to remedy violations of the IMWL and the IWPCA.

## JURISDICTION AND VENUE

18.    Under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b), this Court has jurisdiction over Plaintiff's FLSA claims.

19.     Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's Illinois law claims.

20.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because the parties reside in this district, and a substantial part of the events giving rise to the claim herein occurred in this district.

## PARTIES

### Plaintiff

### Samantha Young

21.     Plaintiff Samantha Young resides in Lisle, Illinois. Further, at all times material herein, Plaintiff worked within the boundaries of Northern District of Illinois.

22.     Plaintiff was an "employee" of all of the Defendants as defined in the FLSA, the IMWL and the IWPCA.

23.     Plaintiff has given written consent to join this action, a copy of which is attached to this Class Action Complaint.

### Defendants

### The "Rolling in the Dough" Defendants

24.     The "Rolling in the Dough Defendants" include Rolling in the Dough, Inc., Rolling in the Dough II, Inc., Kenneth Lindeman, and Domino's.

25.     The Rolling in the Dough Defendants form a single employer or single integrated enterprise as they share functional interrelation of operations, common management, centralized control of labor relations, and common ownership.

4

26.     The Rolling in the Dough Defendants operate several Domino's Pizza restaurants in the state of Illinois.

27.     The Rolling in the Dough Defendants constitute joint employers as they co-determine matters governing essential terms and conditions of employment, share ability to hire, fire and discipline employees, share ability to affect compensation and benefits, and share authority to direct and supervise employees' performance.

28.     During all relevant times, upon information and belief, the Rolling in the Dough Defendants permitted employees to transfer or be shared by and between the Domino's restaurants without retraining.

29.     The Rolling in the Dough Defendants have suffered or permitted Plaintiff and other delivery drivers to work.

30.     Each of the Rolling in the Dough Defendants have control or custody of the employment of Plaintiff and similarly situated employees, and the place where Plaintiff and similarly situated employees worked.

31.     Each of the Rolling in the Dough Defendants had control over Plaintiff's and similarly situated delivery drivers' working conditions.

**The "JWG" Defendants**

32.     The "JWG Defendants" include JWG Enterprises, LLC, John W. Groll III, and Domino's.

33.     The JWG Defendants form a single employer or single integrated enterprise as they share functional interrelation of operations, common management, centralized control of labor relations, and common ownership.

5

34. The JWG Defendants operate several Domino's Pizza restaurants in the state of Illinois.

35. The JWG Defendants constitute joint employers as they co-determine matters governing essential terms and conditions of employment, share ability to hire, fire and discipline employees, share ability to affect compensation and benefits, and share authority to direct and supervise employees' performance.

36. The JWG Defendants have suffered or permitted Plaintiff and other delivery drivers to work.

37. Each of the JWG Defendants have control or custody of the employment of Plaintiff and similarly situated employees, and the place where Plaintiff and similarly situated employees worked.

38. Each of the JWG Defendants had control over Plaintiff's and similarly situated delivery drivers' working conditions.

**Rolling in the Dough, Inc.**

39. Defendant Rolling in the Dough, Inc. is a for-profit corporation registered to do business in Illinois.

40. Rolling in the Dough, Inc. is the corporate entity that appears on Plaintiff's paystubs for work she completed in Willowbrook, Illinois.

41. The president and secretary of Rolling in the Dough, Inc. is Kenneth R. Lindeman.

6

42.     Rolling in the Dough, Inc. has substantial control over Plaintiff and similarly situated employees' working conditions, and over the unlawful policies and practices alleged herein.

43.     Rolling in the Dough, Inc. has direct or indirect control of the terms and conditions of Plaintiff's work and the work of similarly situated employees.

44.     At all relevant times, Rolling in the Dough, Inc. maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, deductions, and other practices.

45.     Rolling in the Dough, Inc. is an "employer" of Plaintiff and similarly situated employees as that term is defined by the FLSA, the IMWL, and the IWPCA.

46.     At all relevant times, Rolling in the Dough, Inc. has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

47.     Rolling in the Dough, Inc.'s gross revenue exceeds $500,000 per year.

**Rolling in the Dough II, Inc.**

48.     Defendant Rolling in the Dough II, Inc. is a for-profit corporation registered to do business in Illinois.

49.     The president and secretary of Rolling in the Dough II, Inc. is Kenneth R. Lindeman.

50.     Rolling in the Dough II, Inc. has substantial control over Plaintiff and similarly situated employees' working conditions, and over the unlawful policies and practices alleged herein.

51.     Rolling in the Dough II, Inc. has direct or indirect control of the terms and conditions of Plaintiff's work and the work of similarly situated employees.

52.     At all relevant times, Rolling in the Dough II, Inc. maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, deductions, and other practices.

53.     Rolling in the Dough II, Inc. is an "employer" of Plaintiff and similarly situated employees as that term is defined by the FLSA, the IMWL, and the IWPCA.

54.     At all relevant times, Rolling in the Dough II, Inc. has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

55.     Rolling in the Dough, Inc.'s gross revenue exceeds $500,000 per year.

**JWG Enterprises, LLC**

56.     Defendant JWG Enterprises, LLC is a limited liability company registered to do business in Illinois.

57.     John W. Groll III is the manager of JWG Enterprises, LLC.

58.     JWG Enterprises, LLC is the corporate entity that appears on Plaintiff's paystubs for work she completed at the Domino's in Lisle, Illinois.

8

59.     JWG Enterprises, LLC has substantial control over Plaintiff and similarly situated employees' working conditions, and over the unlawful policies and practices alleged herein.

60.     JWG Enterprises, LLC has direct or indirect control of the terms and conditions of Plaintiff's work and the work of similarly situated employees.

61.     At all relevant times, JWG Enterprises, LLC maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, deductions, and other practices.

62.     JWG Enterprises, LLC is an "employer" of Plaintiff and similarly situated employees as that term is defined by the FLSA, the IMWL, and the IWPCA.

63.     At all relevant times, JWG Enterprises, LLC has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

64.     JWG Enterprises, LLC's gross revenue exceeds $500,000 per year.

**Domino's Pizza, Inc.**

65.     Defendant Domino's Pizza, Inc. is a foreign corporation organized under the laws of the state of Delaware, with its principal place of business in Michigan.

66.     Domino's Pizza, Inc. is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the IMWL, and the IWPCA.

67.     Upon information and belief, Domino's Pizza, Inc. applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all

of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

68.     At all relevant times, Domino's Pizza, Inc. maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, and other practices.

69.     At all relevant times, Domino's Pizza, Inc. has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

70.     Domino's Pizza, Inc.'s gross revenue exceeds $500,000 per year.

**Domino's Pizza, LLC**

71.     Defendant Domino's Pizza, LLC is a foreign limited liability company organized under the laws of the state of Michigan.

72.     Domino's Pizza, LLC is a wholly owned subsidiary of Domino's Pizza, Inc.

73.     Domino's Pizza, LLC is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the IMWL, and the IWPCA.

74.     Upon information and belief, Domino's Pizza, LLC applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

75.     At all relevant times, Domino's Pizza, LLC maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates,, and other practices.

76. At all relevant times, Domino's Pizza, LLC has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

77. Domino's Pizza, LLC's gross revenue exceeds $500,000 per year.

**Domino's Pizza Franchising, LLC**

78. Defendant Domino's Pizza Franchising, LLC is a foreign limited liability company organized under the laws of the state of Delaware, with its principal place of business in Michigan.

79. Domino's Pizza Franchising, LLC is a wholly owned subsidiary of Domino's Pizza, Inc.

80. Domino's Pizza Franchising, LLC is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the IMWL, and the IWPCA.

81. Upon information and belief, Domino's Pizza Franchising, LLC applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

82. At all relevant times, Domino's Pizza Franchising, LLC maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates,, and other practices.

83.     At all relevant times, Domino's Pizza Franchising, LLC has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

84.     Domino's Pizza Franchising, LLC's gross revenue exceeds $500,000 per year.

**Kenneth Lindeman**

85.     Defendant Kenneth Lindeman is the president and secretary of Rolling in the Dough, Inc. and Rolling in the Dough II, Inc.

86.     Kenneth Lindeman is the founder of Rolling in the Dough, Inc. and Rolling in the Dough II, Inc.

87.     Kenneth Lindeman is the owner of Rolling in the Dough, Inc. and Rolling in the Dough II, Inc.

88.     Kenneth Lindeman is individually liable to delivery drivers at the Rolling in the Dough Domino's restaurants under the definitions of "employer" set forth in the FLSA, the IMWL, and the IWPCA because he owns and operates the Rolling in the Dough Defendant entities, serves as a member of the Rolling in the Dough Defendant entities, ultimately controls significant aspects of the Rolling in the Dough Defendant entities' day-to-day functions, and ultimately controls compensation and reimbursement of employees.  29 U.S.C. § 203(d).

89.     At all relevant times, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman has had financial control over the operations at each of the named corporate defendants.

90. At all relevant times, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman has a role in significant aspects of the Rolling in the Dough Defendants' day to day operations.

91. At all relevant times, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman has had control over the Rolling in the Dough Defendants' pay policies.

92. At all relevant times, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman has had power over personnel and payroll decisions at the Rolling in the Dough restaurants, including but not limited to influence of delivery driver pay.

93. At all relevant times, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman has had the power to hire, fire and discipline employees, including Plaintiff and other delivery drivers at the Rolling in the Dough restaurants.

94. At all relevant times, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman has had the power to stop any illegal pay practices that harmed Plaintiff and similarly situated employees.

95. At all times relevant, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman has had the power to transfer the assets and liabilities of the Rolling in the Dough Defendants.

96. At all relevant times, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman has had the power to declare bankruptcy on behalf of each of the Rolling in the Dough Defendants.

97.     At all relevant times, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman has had the power to enter into contracts on behalf of each of the Rolling in the Dough Defendants.

98.     At all relevant times, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman has had the power to close, shut down, and/or sell each of the Rolling in the Dough Defendants.

99.     At all relevant times, by virtue of his role as president and secretary of the Rolling in the Dough Defendants, Kenneth Lindeman had authority over the overall direction of each of Rolling in the Dough Defendants and was ultimately responsible for their operations.

100.    The Rolling in the Dough Defendants function for Kenneth Lindeman's profit.

101.    Kenneth Lindeman has influence over how the Rolling in the Dough restaurants can run more profitably and efficiently.

**John W. Groll III**

102.    Defendant John W. Groll III is the manager of JWG Enterprises, LLC.

103.    John W. Groll III is the founder of JWG Enterprises, LLC.

104.    John W. Groll III is the owner of JWG Enterprises, LLC.

105.    John W. Groll III is individually liable to delivery drivers at the JWG Domino's restaurants under the definitions of "employer" set forth in the FLSA, the IMWL, and the IWPCA because he owns and operates the JWG Defendant entities, serves as a member of the JWG Defendant entities, ultimately controls significant aspects of the JWG Defendant entities' day-to-day functions, and ultimately controls compensation and reimbursement of employees. 29 U.S.C. § 203(d).

106. At all relevant times, by virtue of his role as manager of the JWG Defendants, John W. Groll III has had financial control over the operations at the JWG restaurants.

107. At all relevant times, by virtue of his role as manager of the JWG Defendants, John W. Groll III has a role in significant aspects of the JWG Defendants' day to day operations.

108. At all relevant times, by virtue of his role as manager of the JWG Defendants, John W. Groll III has had control over the JWG Defendants' pay policies.

109. At all relevant times, by virtue of his role as manager of the JWG Defendants, John W. Groll III has had power over personnel and payroll decisions at the JWG restaurants, including but not limited to influence of delivery driver pay.

110. At all relevant times, by virtue of his role as manager of the JWG Defendants, John W. Groll III has had the power to hire, fire and discipline employees, including Plaintiff and other delivery drivers at the JWG restaurants.

111. At all relevant times, by virtue of his role as manager of the JWG Defendants, John W. Groll III has had the power to stop any illegal pay practices that harmed Plaintiff and similarly situated employees.

112. At all times relevant, by virtue of his role as manager of the JWG Defendants, John W. Groll III has had the power to transfer the assets and liabilities of the JWG Defendants.

113. At all relevant times, by virtue of his role as manager of the JWG Defendants, John W. Groll III has had the power to declare bankruptcy on behalf of each of the JWG Defendants.

114. At all relevant times, by virtue of his role as manager of the JWG Defendants, John W. Groll III has had the power to enter into contracts on behalf of each of the JWG Defendants.

115. At all relevant times, by virtue of his role as manager of the JWG Defendants, John W. Groll III has had the power to close, shut down, and/or sell each of the JWG Defendants.

116. At all relevant times, by virtue of his role as manager of the JWG Defendants, John W. Groll III had authority over the overall direction of each of JWG Defendants and was ultimately responsible for their operations.

117. The JWG Defendants function for John W. Groll III's profit.

118. John W. Groll III has influence over how the JWG restaurants can run more profitably and efficiently.

## FACTS

### CLASSWIDE FACTUAL ALLEGATIONS

**The JWG Defendants**

119. During all relevant times, the JWG Defendants have operated Domino's Pizza restaurants in the state of Illinois.

120. The primary function of the JWG restaurants is to sell pizza and other food items to customers, whether they carry out or have their food delivered.

121. Each of the JWG restaurants employs delivery drivers who are primarily responsible for delivering pizzas and other food items to customers' homes and workplaces.

16

122.    Plaintiff and the similarly situated persons Plaintiff seeks to represent are current and former delivery drivers employed by the JWG Defendants.

123.    All delivery drivers employed by the JWG Defendants over the last three years have had essentially the same job duties—deliver pizza and other food items to customers.

124.    When there are no deliveries to make, the JWG Defendants' delivery drivers are required to work inside the JWG restaurants building pizza boxes, cleaning, preparing pizza and other food items, taking orders, and completing other duties inside the restaurant as necessary.

125.    Throughout her employment, the JWG Defendants agreed to pay Plaintiff and similarly situated delivery drivers minimum wage minus a tip credit for the hours they spent working inside the JWG restaurants.

126.    Throughout her employment, the JWG Defendants agreed to pay Plaintiff and similarly situated delivery drivers minimum wage minus a tip credit for the hours they spend making deliveries for the JWG Defendants. Plaintiff was paid $5.75 for all hours worked.

127.    The JWG Defendants require delivery drivers to maintain and pay for operable, safe, and legally compliant automobiles to use in delivering the JWG Defendants' pizza and other food items.

128.    The JWG Defendants require delivery drivers to incur and/or pay job-related expenses, including but not limited to automobile costs and depreciation, gasoline expenses, automobile maintenance and parts, insurance, and other equipment necessary for delivery drivers to complete their job duties.

129.    Pursuant to such requirements, Plaintiff and other similarly situated employees purchase gasoline, vehicle parts and fluids, automobile repair and maintenance services,

automobile insurance, suffered automobile depreciation, and incurred cell phone and data charges all for the primary benefit of the JWG Defendants.

130.    At all relevant times, Plaintiff and other similarly situated delivery drivers at the JWG restaurants were reimbursed a flat per delivery amount.

131.    Plaintiff and similarly situated delivery drivers were reimbursed $1.05 per delivery by the JWG Defendants.

132.    At all relevant times, Defendants have failed to pay Plaintiff and similarly situated delivery drivers the legally required minimum wage and overtime wages because they failed to adequately reimburse them for their automobile expenses or other job-related expenses.

133.    Plaintiff and similarly situated delivery drivers typically average approximately five miles per round-trip delivery.

134.    Plaintiff and similarly situated delivery drivers typically make approximately 2-3 deliveries per hour.

135.    According to the Internal Revenue Service, the standard mileage rate for the use of a car during the relevant time periods have been:

>       a.    2014: 56 cents/mile
>       b.    2015: 57.5 cents/mile
>       c.    2016: 54 cents/mile
>       d.    2017: 53.5 cents/mile

136.    Plaintiff and similarly situated delivery drivers at the JWG restaurants also had deductions taken from their wages for the costs of uniforms bearing the Domino's logo.

137.    The uniform deduction taken from Plaintiff and similarly situated delivery drivers' wages was for the benefit of the JWG Defendants.

138.    The uniform deduction taken from Plaintiff and similarly situated delivery drivers' wages caused their effective hourly wage rate to drop below minimum wage.

139.    As a result of the automobile and other job-related expenses and deductions incurred by Plaintiff and other similarly situated delivery drivers, they were deprived of minimum wage and overtime wages guaranteed to them by the FLSA and Illinois law.

140.    At all relevant times, Defendants apply the same pay policies, practices, and procedures to all delivery drivers at the JWG restaurants.

141.    All of the JWG Defendants' delivery drivers had similar experiences to those of Plaintiff. They were paid tipped minimum wage for all hours worked, were subject to the same reimbursement policy; received similar reimbursements; incurred similar automobile expenses; and completed deliveries of similar distances and at similar frequencies.

142.    Regardless of the precise amount of the per-delivery reimbursement at any given point in time, the JWG Defendants' reimbursement formula has resulted in an unreasonable underestimation of delivery drivers' automobile expenses throughout the recovery period, causing systematic violations of the federal minimum wage.

143.    Because the JWG Defendants paid their drivers a gross hourly wage at precisely, or at least very close to, the applicable minimum wage, and because the delivery drivers incurred unreimbursed automobile expenses, the delivery drivers "kicked back" to the JWG Defendants an amount sufficient to cause minimum wage violations.

144.    While the amount of the JWG Defendants' actual reimbursements per delivery may vary somewhat over time, the JWG Defendants are relying on the same flawed policy and methodology with respect to all delivery drivers at all of their other Domino's stores. Thus,

although reimbursement amounts may differ somewhat by time or region, the amounts of under-reimbursements relative to automobile costs incurred are relatively consistent between time and region.

145.    The JWG Defendants have willfully failed to pay federal and Illinois state minimum wage and overtime to Plaintiff and similarly situated delivery drivers at the JWG restaurants.

**The Rolling in the Dough Defendants**

146.    During all relevant times, the Rolling in the Dough Defendants have operated Domino's Pizza restaurants in the state of Illinois.

147.    The primary function of the Rolling in the Dough restaurants is to sell pizza and other food items to customers, whether they carry out or have their food delivered.

148.    Each of the Rolling in the Dough restaurants employs delivery drivers who are primarily responsible for delivering pizzas and other food items to customers' homes and workplaces.

149.    Plaintiff and the similarly situated persons Plaintiff seeks to represent are current and former delivery drivers employed by the Rolling in the Dough Defendants.

150.    All delivery drivers employed by the Rolling in the Dough Defendants over the last three years have had essentially the same job duties—deliver pizza and other food items to customers.

151.    When there are no deliveries to make, the Rolling in the Dough Defendants' delivery drivers are required to work inside the Rolling in the Dough restaurants building pizza

boxes, cleaning, preparing pizza and other food items, taking orders, and completing other duties inside the restaurant as necessary.

152.     Throughout her employment, Defendants agreed to pay Plaintiff and similarly situated delivery drivers minimum wage minus a tip credit for the hours they spent working inside the Rolling in the Dough restaurants.

153.     The Rolling in the Dough Defendants failed to inform Plaintiff and similarly situated delivery drivers of the tip credit requirements of the FLSA.

154.     Throughout her employment, Defendants agreed to pay Plaintiff and similarly situated delivery drivers minimum wage minus a tip credit for the hours they spend making deliveries for the Rolling in the Dough Defendants. Plaintiff was paid $6.00 for all hours worked.

155.     The Rolling in the Dough Defendants require delivery drivers to maintain and pay for operable, safe, and legally compliant automobiles to use in delivering the Rolling in the Dough Defendants' pizza and other food items.

156.     The Rolling in the Dough Defendants require delivery drivers to incur and/or pay job-related expenses, including but not limited to automobile costs and depreciation, gasoline expenses, automobile maintenance and parts, insurance, and other equipment necessary for delivery drivers to complete their job duties.

157.     Pursuant to such requirements, Plaintiff and other similarly situated employees purchase gasoline, vehicle parts and fluids, automobile repair and maintenance services, automobile insurance, suffered automobile depreciation, and incurred cell phone and data charges all for the primary benefit of the Rolling in the Dough Defendants.

21

158.   At all relevant times, Plaintiff and other similarly situated delivery drivers at the Rolling in the Dough restaurants were reimbursed a flat per delivery amount.

159.   Plaintiff and similarly situated delivery drivers were reimbursed approximately $.97 per delivery by the Rolling in the Dough Defendants.

160.   At all relevant times, Defendants have failed to pay Plaintiff and similarly situated delivery drivers the legally required minimum wage and overtime wages because they failed to adequately reimburse them for their automobile expenses or other job-related expenses.

161.   Plaintiff and similarly situated delivery drivers typically average six to seven miles per round-trip delivery.

162.   Plaintiff and similarly situated delivery drivers typically make approximately 2 deliveries per hour.

163.   According to the Internal Revenue Service, the standard mileage rate for the use of a car during the relevant time periods have been:

   a. 2014: 56 cents/mile
   b. 2015: 57.5 cents/mile
   c. 2016: 54 cents/mile
   d. 2017: 53.5 cents/mile

164.   Plaintiff and similarly situated delivery drivers at the Rolling in the Dough restaurants also had deductions taken from their wages for the costs of uniforms bearing the Domino's logo.

165.   The uniform deduction taken from Plaintiff and similarly situated delivery drivers' wages was for the benefit of the Rolling in the Dough Defendants.

166.   The uniform deduction taken from Plaintiff and similarly situated delivery drivers' wages caused their effective hourly wage rate to drop below minimum wage.

167.    Plaintiff and similarly situated delivery drivers at the Rolling in the Dough restaurants also had deductions taken from their wages as contributions to the Domino's Partners Foundation.

168.    The Partners Foundation deduction taken from Plaintiff and similarly situated delivery drivers' wages was for the benefit of the Rolling in the Dough Defendants.

169.    The Partners Foundation allows the Rolling in the Dough Defendants to offer an employee benefit to all Domino's employees in times of financial hardship, including on-the-job accidents, medical emergencies, fires or natural disasters, or the death of an immediate family member. All Domino's employees, even those who do not contribute to the Foundation, can apply for benefits.

170.    The Partners Foundation is operated out of Domino's headquarters at 30 Frank Lloyd Drive, Ann Arbor, Michigan 48106-0997. https://biz.dominos.com/web/public/about-dominos/team-member-support

171.    The Partners Foundation deduction taken from Plaintiff and similarly situated delivery drivers' wages caused their effective hourly wage rate to drop below minimum wage.

172.    As a result of the automobile and other job-related expenses and deductions incurred by Plaintiff and other similarly situated delivery drivers, they were deprived of minimum wage and overtime wages guaranteed to them by the FLSA and Illinois law.

173.    At all relevant times, Defendants apply the same pay policies, practices, and procedures to all delivery drivers at the Rolling in the Dough restaurants.

174.    All of the Rolling in the Dough Defendants' delivery drivers had similar experiences to those of Plaintiff. They were paid tipped minimum wage for all hours worked,

were subject to the same reimbursement policy; received similar reimbursements; incurred similar automobile expenses; and completed deliveries of similar distances and at similar frequencies.

175. Regardless of the precise amount of the per-delivery reimbursement at any given point in time, the Rolling in the Dough Defendants' reimbursement formula has resulted in an unreasonable underestimation of delivery drivers' automobile expenses throughout the recovery period, causing systematic violations of the federal minimum wage.

176. Because the Rolling in the Dough Defendants paid their drivers a gross hourly wage at precisely, or at least very close to, the applicable minimum wage, and because the delivery drivers incurred unreimbursed automobile expenses, the delivery drivers "kicked back" to the Rolling in the Dough Defendants an amount sufficient to cause minimum wage violations.

177. While the amount of the Rolling in the Dough Defendants' actual reimbursements per delivery may vary somewhat over time, the Rolling in the Dough Defendants are relying on the same flawed policy and methodology with respect to all delivery drivers at all of their other Domino's stores. Thus, although reimbursement amounts may differ somewhat by time or region, the amounts of under-reimbursements relative to automobile costs incurred are relatively consistent between time and region.

178. The Rolling in the Dough Defendants have willfully failed to pay federal and Illinois state minimum wage and overtime to Plaintiff and similarly situated delivery drivers at the Rolling in the Dough restaurants.

**PLAINTIFF'S INDIVIDUAL FACTUAL ALLEGATIONS**

24

179.    Consistent with their policies, patterns, and practices as described herein, Defendants harmed Plaintiff, individually, as follows:

180.    Plaintiff worked as a delivery driver for Domino's Pizza located on Ogden Road in Lisle, Illinois from March 2017 to July 2017 for the JWG Defendants.

181.    At JWG, Plaintiff's job duties included delivering pizzas and other food items to customers at their homes and workplaces, and completing various tasks inside the store.

182.    Plaintiff's tasks inside the JWG restaurants included tending the oven, taking orders, building pizza boxes, taking out trash, sweeping the food line, mopping, doing dishes, making pizzas, and completing other general tasks inside the restaurant.

183.    Plaintiff regularly spent about a quarter to a third of her time at work inside the JWG restaurants working in a non-tipped capacity.

184.    The JWG Defendants required Plaintiff to maintain and pay for operable, safe, and legally compliant automobiles to use in delivering pizza.

185.    Plaintiff was required to purchase gasoline, oil and other fluids, vehicle parts, auto repair and maintenance parts and services, and auto insurance for the benefit of the JWG Defendants.

186.    Plaintiff's car depreciated in value as a result of the work she completed for the JWG Defendants.

187.    The JWG Defendants never attempted to track how much money Plaintiff was paying out of pocket in order to make deliveries on their behalf.

188.    The JWG Defendants never required Plaintiff to record or report the expenditures she made for her car, gasoline, and/or for other job-related expenses.

189.    At all relevant times during her employment at JWG, the JWG Defendants promised to pay Plaintiff $6.00 per hour for all hours worked. The JWG Defendants also promised to pay other delivery drivers at a particular tipped wage rate for all hours worked.

190.    At all relevant times at JWG, Plaintiff received a flat delivery reimbursement amount of approximately $1.05 for each delivery she completed. This reimbursement rate was the same no matter how many miles she drove.

191.    Plaintiff delivered approximately 2-3 orders per hours at JWG.

192.    Plaintiff drove approximately 5 miles per delivery at JWG.

193.    Thus, the JWG Defendants' average effective reimbursement rate for Plaintiff was approximately $.21 per mile ($1.05 per delivery / 5 average miles per delivery).

194.    In 2017, the IRS business mileage reimbursement has been $.535 per mile, which reasonably approximated the automobile expenses incurred delivering pizzas. http://www.irs.gov/Tax-Professionals/Standard-Mileage-Rates. Using that IRS rate as a reasonable approximation of Plaintiff's automobile expenses, every mile driven on the job decreased his net wages by approximately $.325 ($.535 - $.21) per mile. Considering Plaintiff's estimate of about 5 average miles per delivery, the JWG Defendants under-reimbursed her about $1.625 per delivery ($.325 x 5 average miles).

195.    Thus, Plaintiff consistently "kicked back" to the JWG Defendants approximately $4.06 per hour ($1.625 per delivery x 2.5 deliveries per hour).

196.    Plaintiff also had deductions taken from her wages for the costs of her uniform, which caused her effectively hourly wage rate to drop below minimum wage.

26

197.     As a result of the JWG Defendants' improper taking of the tip credit, and unreimbursed automobile expenses, the JWG Defendants have failed to pay Plaintiff minimum wage as required by law.

198.     During Plaintiff's employment with the JWG Defendants, the JWG Defendants failed to adequately reimburse Plaintiff for automobile and other job-related expenses.

199.     As a result of unreimbursed automobile expenses and other job-related expenses, the JWG Defendants have failed to pay Plaintiff minimum wage as required by law.

200.     Plaintiff did not receive her final paycheck for the work she performed for the Rolling in the Dough Defendants.

201.     Plaintiff worked as a delivery driver for Domino's Pizza located in Willowbrook, Illinois in July 2017 for the Rolling in the Dough Defendants.

202.     At Rolling in the Dough, Plaintiff's job duties included delivering pizzas and other food items to customers at their homes and workplaces, and completing various tasks inside the store.

203.     Plaintiff's tasks inside the Rolling in the Dough restaurants included tending the oven, taking orders, building pizza boxes, taking out trash, sweeping the food line, mopping, doing dishes, making pizzas, and completing other general tasks inside the restaurant.

204.     Plaintiff regularly spent about a quarter to a third of her time at work inside the Rolling in the Dough restaurants working in a non-tipped capacity.

205.     The Rolling in the Dough Defendants required Plaintiff to maintain and pay for operable, safe, and legally compliant automobiles to use in delivering pizza.

27

206.    Plaintiff was required to purchase gasoline, oil and other fluids, vehicle parts, auto repair and maintenance parts and services, and auto insurance for the benefit of the Rolling in the Dough Defendants.

207.    Plaintiff's car depreciated in value as a result of the work she completed for the Rolling in the Dough Defendants.

208.    The Rolling in the Dough Defendants never attempted to track how much money Plaintiff was paying out of pocket in order to make deliveries on their behalf.

209.    The Rolling in the Dough Defendants never required Plaintiff to record or report the expenditures she made for her car, gasoline, and/or for other job-related expenses.

210.    At all relevant times during her employment at Rolling in the Dough, the Rolling in the Dough Defendants promised to pay Plaintiff $6.00 per hour for all hours worked. The Rolling in the Dough Defendants also promised to pay other delivery drivers at a particular tipped wage rate for all hours worked.

211.    The Rolling in the Dough Defendants failed to inform Plaintiff of the tip credit requirements of the FLSA.

212.    At all relevant times at Rolling in the Dough, Plaintiff received a flat delivery reimbursement amount of approximately $.97 for each delivery she completed. This reimbursement rate was the same no matter how many miles she drove.

213.    Plaintiff delivered approximately 2 orders per hours at Rolling in the Dough.

214.    Plaintiff drove approximately 6 to 7 miles per delivery at Rolling in the Dough.

215. Thus, the Rolling in the Dough Defendants' average effective reimbursement rate for Plaintiff was approximately $.149 per mile ($.97 per delivery / 6.5 average miles per delivery).

216. In 2017, the IRS business mileage reimbursement has been $.535 per mile, which reasonably approximated the automobile expenses incurred delivering pizzas. http://www.irs.gov/Tax-Professionals/Standard-Mileage-Rates. Using that IRS rate as a reasonable approximation of Plaintiff's automobile expenses, every mile driven on the job decreased his net wages by approximately $.386 ($.535 - $.149) per mile. Considering Plaintiff's estimate of about 6.5 average miles per delivery, the Rolling in the Dough Defendants under-reimbursed her about $2.509 per delivery ($.386 x 6.5 average miles).

217. Thus, Plaintiff consistently "kicked back" to the Rolling in the Dough Defendants approximately $5.018 per hour ($2.509 per delivery x 2 deliveries per hour).

218. Plaintiff also had deductions taken from her wages for the costs of her uniform, which caused her effectively hourly wage rate to drop below minimum wage. Plaintiff did not receive a uniform from the Rolling in the Dough Defendants.

219. Plaintiff had deductions taken from her wages for the Domino's Partners Foundation.

220. Plaintiff did not agree to have a deduction taken from her wages for the Domino's Partners Foundation.

221. As a result of the Rolling in the Dough Defendants' improper taking of the tip credit, and unreimbursed automobile expenses, the Rolling in the Dough Defendants have failed to pay Plaintiff minimum wage as required by law.

222.     During Plaintiff's employment with the Rolling in the Dough Defendants, the Rolling in the Dough Defendants failed to adequately reimburse Plaintiff for automobile and other job-related expenses.

223.     As a result of unreimbursed automobile expenses and other job-related expenses, the Rolling in the Dough Defendants have failed to pay Plaintiff minimum wage as required by law.

## JOINT EMPLOYER ALLEGATIONS

224.     At all relevant times, Domino's jointly employed Plaintiff and similarly situated employees at the JWG restaurants and the Rolling in the Dough restaurants.

225.     According to Domino's Annual Report for 2016, it is the number one pizza delivery chain in the United States, holding approximately 28% of the total market share for pizza delivery.

226.     In 2016 alone, Domino's grossed $10,000,000,000.00 on delivery sales.

227.     The vast majority of the pizzas and other food items Domino's claims to have sold and delivered in 2016 were delivered by delivery drivers in franchise stores, like Plaintiff and his similarly situated delivery drivers at the Cincinnati Regional Stores.

228.     In 2016, ninety-three percent—4,979 out of 5,371—of Domino's restaurants nationwide were owned by franchisees.

229.     Further, recent trends show that Domino's is becoming even more franchise dominant.  Between 2014 and 2016, Domino's has opened 367 new domestic franchise stores, and 18 new corporate-owned stores.

230.    In fiscal year 2016, Domino's earned approximately $312,300,000.00 in sales and profits through franchise stores like the JWG restaurants and the Rolling in the Dough restaurants.

231.    Conversely, according to Domino's, each franchise store generates an average annual profit of $120,000.00 for itself.

232.    As Domino's explains, their success is about the strength of the brand itself. Domino's believes consumers associate their brand with the timely delivery of quality, affordable food.

233.    However, the vast majority of the individuals who make those timely deliveries are employed in franchise stores, like the JWG restaurants and the Rolling in the Dough restaurants.

234.    Domino's exercises substantial control over Plaintiff and similarly situated delivery drivers, both directly and indirectly.

235.    Domino's has the power to curtail the unlawful policies, patterns and/or practices alleged herein, but has refrained from doing so in order to continue to reap the profits from the franchise relationship.

236.    Domino's has a clear and direct interest in franchise stores minimizing labor costs to increase profitability—even if it means minimizing labor costs below state and federal minimums—particularly if they are permitted to collect profits while also being insulated from legal liability.

**Domino's Indirectly Exercises Control Over Delivery Drivers by Controlling Franchisees**

237.    Domino's' Standard Franchise Agreement requires franchisees to adhere to the "Domino's System," which requires stores to "conduct business under a uniform business

31

format, with specially designed equipment, computer hardware and software designated by us, and specifications for the preparation and sale of pizza and certain authorized food products."

238.    Adherence to the Domino's System is required, and failure to comply with Domino's policies and procedures can and does result in a franchise's termination.

239.    Through the Domino's System, Domino's controls the actual labor needs of franchise stores, labor budget and allocation for franchise stores, employees' job duties at franchise stores, behavioral policies and procedures at franchise stores, employee training at franchise stores, supply of food, products, and training at franchise stores, advertising and marketing at franchise stores, and the overall operational system and budget of franchise stores, including the JWG restaurants and the Rolling in the Dough restaurants.

240.    Domino's' 800-page Manager's Guide is a "veritable bible for overseeing a Domino's operation … that literally leaves nothing to chance." *Parker v. Domino's, Inc.*, 629 So. 2d 1026, 1028-29 (Fla. App. 4th Dist. 1993).

241.    In addition to the Manager's Guide and hundreds of other operational materials provided by Domino's, franchise stores are required to purchase, install, and use Domino's' PULSE operating system. PULSE is a comprehensive operating system, used for point-of-sale functions, and for recording employees' worktime using individual employee codes, tracking employee work tasks continuously, recording tips, tracking pizza delivery information, maintaining personnel data, monitoring store hours and product prices, and generating sales, revenue, and payroll reports.

242. PULSE is used in 99% of franchise stores. According to Domino's, PULSE costs between $15,000 and $25,000 per store to purchase and install, and $4,500 per store per year to maintain.

243. Franchise stores are contractually obligated to provide Domino's full access to their business information, therefore Domino's has constant, real-time access to all information stored in PULSE in any franchise store nationwide, and reviews certain aspects of that information from all its stores daily.

244. PULSE tracks, minute-by-minute, all tasks completed after an order is received, and which employee completes each task.

245. Domino's uses the PULSE system to monitor employee activity.

246. The PULSE Labor Tools use each store's historical menu mix and sales data to determine what type of employees need to be staffed where, and for how long. The PULSE system and corporate policy dictates to franchisees exactly how many workers they should have depending on PULSE's precise measurements of workload.

247. The PULSE Payroll Report is to be used for viewing payroll information, including clock-in and clock-out times, and generating payroll information to give to your accountant or payroll service.

248. Franchise stores are required to adhere to Domino's' conditions regarding property leases and the layout and aesthetic of store itself.

249. Domino's must approve of all franchisee leases. Leases have to conform with Domino's requirements for its corporate owned locations.

250.     By the end of 2017, all franchise stores are expected to convert the physical layout of the store to the "Pizza Theater" design created by Domino's corporate.

251.     According to Domino's, the Pizza Theater is designed to minimize costs relating to staffing.

252.     Franchise stores are required to contribute 6% of their retail sales to fund national marketing and advertising campaigns.  Domino's Pizza, Inc.'s subsidiary, Domino's National Advertising Fund Inc., has authority over how these funds are spent.

253.     Over the past five years, U.S. Domino's stores (93% of which are franchise stores) have invested an estimated $1.5 billion in national, co-operative, and local advertising, according to Domino's' mandate.

254.     Domino's SFA requires new franchisees to spend at least $3,000.00 within the first three months on grand opening advertising and promotion.

255.     Domino's recently underwent an aggressive advertising campaign where they invited and openly acknowledged negative feedback from consumers.  Domino's acknowledges that, "without the buy-in from our franchise owners, we couldn't have done it."

256.     Domino's requires franchise stores to offer substantially the same menu items.

257.     Domino's has created a "vertically integrated dough manufacturing and supply chain," whereby franchise stores are required to purchase the ingredients and materials necessary to operate their stores directly from the Domino's Internal Dough Manufacturing and Supply Chain System.

258.     In 2016, Domino's generated $1,544,300,000.00 in revenue from its supply chain alone.

259. By monopolizing the supply chain, Domino's allows franchisees even less flexibility in allocating their budget.

260. Domino's digital ordering and marketing platforms have also changed the way employees spend their time while working at franchise stores, including the JWG restaurants and the Rolling in the Dough restaurants.

261. In 2010, Domino's decided to develop their own online ordering platform and to manage this important and growing area of their business internally.

262. Franchise stores are required to accept orders over Domino's digital platforms, and are not permitted to opt out of Domino's digital ordering platforms.

263. In 2016, more than half of all sales in the United States (including both corporate owned and franchise stores) were ordered digitally through Domino's' fifteen proprietary digital ordering platforms.

264. Domino's' digital ordering platforms directly influence the terms and conditions of employment at Domino's franchise stores. With over fifty percent of orders being placed online without the assistance of an in-store employee, franchise employees' job duties and time at work can and have been re-allocated to other tasks.

265. In addition to requiring franchisees to pay them for advertising fees, pay them for the PULSE operating system, and pay them for the food and material needed to make Domino's' products, Domino's requires franchise stores to pay to pay 5.5% of royalty sales to Domino's.

266. Domino's sets employee standards, and enforces those standards through regular communications with franchisees and in-person inspections throughout the year.

267.    Domino's goes beyond the supervision of food quality, instead engaging in co-supervision or co-management of everyday store operations and employee activities.

268.    Domino's typically requires prospective franchisees to manage a Domino's location for at least one year prior to entering into the franchise agreement, because this enables Domino's to observe the operational and financial performance of a potential franchisee prior to entering into a long-term contract.

269.    Domino's Franchise Operations personnel provide guidance and supervision to franchise employees through on-site visits and instructions.

270.    In order to deviate from the Manager's Guide, franchisees must apply to Domino's for a "variance."

271.    Domino's maintains a productive relationship with their independent franchise owners through regional franchise teams, distributing materials that help franchise stores comply with Domino's standards and using franchise advisory groups that facilitate communications between Domino's and their franchisees.

272.    According to Domino's, at least three times per year, Domino's conducts site inspections of franchise stores, called Operations Evaluations Reports. A Domino's Evaluation inspector makes an unannounced visit to each store, assessing every aspect of store operations, and awarding it a score from 0 to 100 for compliance with Domino's standards.

273.    Franchise stores who receive low Evaluation scores are given a Notice of Default, and required to submit an action plan to Domino's Area Leaders. If a franchisee receives three Notices of Default in one year, the franchise can be terminated even if the defaults were corrected.

274.    In addition to Evaluations, Area Leaders regularly make unannounced visits to franchise stores.

275.    Domino's has the power to terminate franchise agreements based on "failure to adhere to specified Company policies and standards."  Upon information and belief, those specified policies and standards include failure to operate the store in full compliance with applicable wage-and-hour laws, or to engage in conduct that adversely affects the Domino's brand and the goodwill of Domino's trademarks.  Therefore, Domino's is ultimately able to control how its franchisees operate, and could have terminated SOP's franchise agreements due to their systematic failure to obey federal and state labor laws.

276.    By mandating the franchise stores operate on a shoestring budget according to their own detailed policies and guidelines, Domino's controls the terms and conditions of Plaintiff's employment and the employment of similarly situated delivery drivers.

**Domino's Directly Controls Delivery Drivers**

277.    Domino's exercises substantial direct control over Plaintiff and similarly situated delivery drivers at the JWG restaurants and the Rolling in the Dough restaurants.

278.    Domino's exercises control over hiring at franchise stores, including the JWG restaurants and the Rolling in the Dough restaurants.

279.    Delivery driver job positions for franchise stores are posted on the Domino's corporate website, www.dominos.com, and contain similar language to the delivery driver position postings for Domino's corporate stores.  The job posting identifies specific job duties and minimum requirements for the job, which are nearly identical across all Domino's stores.

280.    Domino's mandates that applicants undergo a background check before they can be hired at franchise stores.

281.    Domino's requires background checks upon hire and at every third anniversary for employees in both corporate and franchise stores.

282.    Domino's requires these background checks to be conducted by one of four pre-determined background check agencies, and themselves mandate the process and criteria for a passable background check, with no input from franchisees.

283.    Domino's background check agencies provide franchisees with a "meets/does not meet" answer for each job applicant, precluding franchisees from considering individual circumstances, or setting the criteria for employment in the first place.

284.    If an applicant meets Domino's criteria and makes it through the door at a franchise store, their job performance is thereafter measured by reference to standards and metrics laid out by Domino's.

285.    Domino's creates, designs, builds and updates all training and development programs for its franchisees and employees.

286.    Domino's states that franchisees are free to create their own training programs, but any training program must contain certain minimum content comparable to that found in the Delivery Safety & Security courses and the following courses from High Performance University Core Operations Training – The Basics: 1. New Team Member Orientation – History & Culture, 2. New Team Member Orientation – Basic Standards, 3. Safety, 4. Robbery Prevention, 5. Cleaning and Sanitation.

287. The distances travelled by Plaintiff and similarly situated delivery drivers per delivery is directly decreed by Domino's.

288. Domino's Standard Franchise Agreement ("SFA") assigns an exclusive area of primary responsibility to each franchised store. Said differently, Domino's determines the delivery radius for each store.

289. Pursuant to the SFA, franchise stores are not permitted to modify their delivery radius without seeking approval from Domino's.

290. Domino's SFA provides that Domino's will proscribe procedures and standards under which franchisees are to determine, on an annual basis, whether certain delivery areas might present a danger to employees.

291. Domino's exercises significant control over the scheduling and workload of franchise employees.

292. Section 12 of the Manager's Guide sets mandatory minimum scheduling and staffing rules for all franchise stores which play a significant role in determining scheduling of those stores' employees.

293. Domino's corporate employees provide franchisees with instructions on how to schedule, including, *e.g.*, to adjust schedules based on PULSE reports regarding delivery times, to "cross train" drivers on in-store tasks to make it possible to schedule more drivers and fewer in-store employees, to schedule enough delivery drivers to eliminate "triples," or deliveries of three different orders during a single delivery run, and to schedule employees in regular 15-minute increments. These types of directives have a direct impact on the employment of Plaintiff and similarly situated delivery drivers.

39

294. By eliminating "triples," for example, Domino's restricts Plaintiff and other delivery drivers' income because they drive longer distances and times to collect the same tips and per delivery reimbursement payments.

295. Company policy dictates that delivery drivers complete their deliveries within 30 minutes of the order being placed. Franchise stores are critiqued based on whether orders were delivered "on-time."

296. Section 12 of the Manager's Guide standards directly impacts franchisee employees' compensation by prohibiting tip jars in franchise stores.

297. Domino's has strict and specific requirements about employee appearance, requiring that employees shave daily, specifying the permitted hair length, restricting piercings and earrings, tattoos, sock and undershirt colors, and uniforms to be worn by employees at franchise stores.

298. The Manager's Guide mandates that delivery drivers, including those at franchise stores, may not carry more than $20 with them during deliveries. Domino's has used this policy to place a franchisee in "default."

299. Domino's also exercises control over discipline and termination decisions. Domino's reserves the right to terminate a franchise if they refuse to comply with Domino's' directives to terminate or discipline an employee.

300. Domino's promotes an anti-union policy to its franchisees, and takes active steps from preventing franchisee employees from creating a union.

301. Specifically, Domino's distributes their own internal union avoidance materials to franchisees, and its HR Director and legal team advise franchisees on how to prevent union

activity. Domino's own head of Human Resources and outside labor counsel have met and consulted with franchise owners regarding potential union activity.

302.    In response to some union activity, Domino's distributed materials stating that "There is no union at Domino's, and the company does not want a union here. We will do everything legally possible to keep a union out."

303.    By restricting or attempting to restrict employees' ability to unionize, Domino's is exercising direct control over franchisee employees.

304.    Domino's is directly involved in customer and employee complaints at franchise stores. Domino's Customer Care Center allows customers and employees to complain directly to Domino's. Domino's then allows the franchisee five days to remedy the situation, while evaluating the timing and adequacy of the response.

305.    Domino's maintains employment records for franchise stores. PULSE contains employees' clock in/out information, first and last names, descriptions and times spent on various job tasks and other timekeeping data for employees, wage rates, tips reported by drivers, and mileage calculations that could be used to reimburse delivery drivers for delivery expenses. Domino's has total access to this data, and accesses it daily.

**Domino's' Ignored and Profited from the Wage Violations**

306.    Domino's' franchise model has been heavily scrutinized for decades.

307.    On May 23, 2016, the Attorney General of the State of New York accused Domino's of many of the same wage violations Plaintiff alleges herein, and also fraud relating to Domino's' failure to inform its franchisees of wage-related "defects" in the PULSE system.

41

*Petition*, *People v. Domino's Inc., et al.* (Sup. Ct. New York County May 23, 2016) (No. 450627-2016).

308.    Domino's has meticulously reviewed and monitored its PULSE systems, and all of its programs and materials for use in its stores.  On a semi-annual basis, Domino's notifies franchisees of various changes and adjustments that have been made to the PULSE system.

309.    Domino's has notified franchisees of hundreds of issues and/or improvements to PULSE over the years, however they have been noticeably silent when a PULSE "defect" results in low-level employees, such as delivery drivers, to be underpaid.

310.    For example, Domino's has been aware since 2007 that the PULSE system does not permit entry of more than one wage rate for the same employee, resulting in delivery employees impermissibly being subjected to the tip credit.  Also, since 2007, Domino's has been aware that PULSE calculates tip credit overtime wages at the wrong rate.

311.    However, despite knowledge of the wage and hour issues created by using PULSE for payroll since 2007, Domino's did nothing to notify franchisees of any problems until May 2015, when they inserted a two-sentence advisement to franchisees tucked within the 800-page Manager's Guide that PULSE was not meant to be a payroll system.

312.    At the same time that Domino's was withholding these PULSE "defects" from its franchisees, Domino's corporate stores had adopted a different software program, PeopleSoft, which contained all of the necessary functions for properly calculating employees' payroll.

313.    Just as Domino's' supply chain is "vertically integrated," so too are the labor policies that relate to Plaintiff and similarly situated delivery drivers.

42

314.     Domino's has been aware and/or should have been aware of the wage and hour violations alleged herein, and has at all times had the authority to stop them from happening.

315.     Along with the other Defendants, Domino's jointly employed Plaintiff and similarly situated delivery drivers at the JWG restaurants and the Rolling in the Dough restaurants.

## COLLECTIVE ACTION ALLEGATIONS

316.     Plaintiff brings the First Count on behalf of two separate collectives under the FLSA:

**The JWG Collective**
All current and former delivery drivers employed at the Domino's Pizza restaurants owned, operated, and controlled by the JWG Defendants nationwide, during the three years prior to the filing of this Class Action Complaint and the date of final judgment in this matter, who elect to opt-in to this action.

**The Rolling in the Dough Collective**
All current and former delivery drivers employed at the Domino's Pizza restaurants owned, operated, and controlled by the Rolling in the Dough Defendants nationwide, during the three years prior to the filing of this Class Action Complaint and the date of final judgment in this matter, who elect to opt-in to this action.

317.     At all relevant times, Plaintiff and the FLSA Collectives have been similarly situated, have had substantially similar job duties, requirements, and pay provisions, and have all been subject to Defendants' decision, policy, plan, practices, procedures, protocols, and rules of willfully refusing to pay Plaintiff and the FLSA Collectives minimum wage for all hours worked. Plaintiff's claims are essentially the same as those of the FLSA Collectives.

318.     Defendants' unlawful conduct is pursuant to a corporate policy or practice of minimizing labor costs by failing to properly pay Plaintiff and the FLSA Collectives.

319.    Defendants are aware or should have been aware that federal law required them to pay employees minimum wage for all hours worked.

320.    Defendants are aware or should have been aware that federal law required them to reimburse delivery workers for expenses relating to "tools of the trade," such as, among other things, automobile costs and gasoline for delivery drivers.

321.    Defendants are aware or should have been aware that federal law prohibited them from taking "kickbacks" from the wages of delivery drivers.

322.    Defendants' unlawful conduct has been widespread, repeated, and consistent.

323.    The First Count is properly brought under and maintained as an opt-in collective action under 29 U.S.C. § 216(b).

324.    The FLSA Collectives members are readily identifiable and ascertainable.

325.    In recognition of the services Plaintiff has rendered and will continue to render to the FLSA Collectives, Plaintiff will request payment of a service award upon resolution of this action.

## **CLASS ACTION ALLEGATIONS**

326.    Plaintiff brings the Second, Third, and Fourth under Federal Rule of Civil Procedure 23, on behalf of herself and a class of persons consisting of:

**The JWG Class**
All current and former delivery drivers employed at the Domino's Pizza restaurants owned, operated, and controlled by the JWG Defendants in Illinois, during the ten years prior to the filing of this Class Action Complaint and the date of final judgment in this matter.

**The Rolling in the Dough Class**
All current and former delivery drivers employed at the Domino's Pizza restaurants owned, operated, and controlled by the Rolling in the Dough

44

Defendants in Illinois, during the ten years prior to the filing of this Class Action Complaint and the date of final judgment in this matter.

327. Excluded from the Rule 23 Classes are Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants; the Judge(s) to whom this case is assigned and any member of the Judges' immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Rule 23 Classes.

328. The number and identity of the Rule 23 Class members are ascertainable from Defendants' records. The hours assigned and worked, the positions held, and the rates of pay and reimbursement for each Rule 23 Class Member are also determinable from Defendants' records. For the purpose of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under Federal Rule of Civil Procedure 23.

329. The Rule 23 Class members are so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

330. There are more than 50 Rule 23 Class members in both the JWG Class and the Rolling in the Dough Class.

331. Plaintiff's claims are typical of those claims which could be alleged by any Rule 23 Class member, and the relief sought is typical of the relief which would be sought by each Rule 23 Class member in separate actions.

332. Plaintiff and the Rule 23 Class members were subject to the same corporate practices of Defendants, as alleged herein, of failing to pay minimum wage, taking "kickbacks" from wages, and failing to reimburse for expenses.

333. Plaintiff and the Rule 23 Class members have all sustained similar types of damages as a result of Defendants' failure to comply with the IMWL and the IWPCA.

334. Plaintiff and the Rule 23 Class members have all been injured in that they have been uncompensated or under-compensated due to Defendants' common policies, practices, and patterns of conduct. Defendants' corporate-wide policies and practices affected all Rule 23 Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each of the Rule 23 Class members.

335. Plaintiff and the Rule 23 Class members sustained similar losses, injuries, and damages arising from the same unlawful practices, polices, and procedures.

336. By seeking to represent the interests of the Rule 23 Class members, Plaintiff is exercising and intends to exercise her right to engage in concerted activity for the mutual aid or benefit of herself and her co-workers.

337. Plaintiff is able to fairly and adequately protect the interests of the Rule 23 Class and has no interests antagonistic to the Rule 23 Class.

338. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation.

339. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation on behalf of minimum wage employees where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that

numerous individual actions engender. Because the losses, injuries, and damages suffered by each of the individual Rule 23 Class members are small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Rule 23 Class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in significant saving of these costs. The prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to the individual Rule 23 Class members, establishing incompatible standards of conduct for Defendants and resulting in the impairment of the Rule 23 Class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

340. Upon information and belief, Defendants and other employers throughout the state violate the IMWL and IWPCA. Current employees are often afraid to assert their rights out of fear of direct and indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

341.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

342.    Common questions of law and fact exist as to the Rule 23 Class that predominate over any questions only affecting Plaintiff and the Rule 23 Class members individually and include, but are not limited to:

a.  Whether Defendants paid Plaintiff and the Rule 23 Class members at the proper minimum wage rate for all hours worked;

b.  Whether Defendants failed to reimburse automobile expenses, gasoline expenses, and other job-related expenses, as described herein, causing Plaintiff and the Rule 23 Class members' wages to drop below legally allowable minimum wage and overtime;

c.  Whether Defendants took impermissible "kickbacks" from the wages of Plaintiff and the Rule 23 Class Members;

d.  Whether Defendants provided proper notice of the tip credit to Plaintiff and the Rule 23 Class as required by 29 U.S.C. § 203(m);

e.  Whether Defendants and the Rule 23 Class members had an agreement that the Rule 23 Class members would be paid a certain amount;

f.  Whether Defendants failed to reimburse automobile expenses, gasoline expenses, and other job-related expenses, as described herein, causing Plaintiff and the Rule 23 Class members to be paid a wage rate lower than the rate Defendants agreed to pay them;

g.  Whether deductions from the wages of the Rule 23 Class members for automobile-related expenses and for payroll deductions were for the benefit of Defendants or the Rule 23 Class members;

h.  Whether Plaintiff and the Rule 23 Class members worked dual jobs;

i.  Whether Defendants failed to pay Plaintiff and the Rule 23 Class members in a timely manner as described by the IWPCA;

j.   Whether Defendants' policy of failing to pay Plaintiff and the Rule 23 Class members was instituted willfully or with reckless disregard of the law; and

k.   The nature and extent of class-wide injury and the measure of damages for those injuries.

343.   In recognition of the services Plaintiff has rendered and will continue to render to the Rule 23 Class, Plaintiff will request payment of a service award upon resolution of this action.

## CAUSES OF ACTION

### Count 1
**Failure to Pay Minimum Wages - Fair Labor Standards Act**
**(On Behalf of Plaintiff, the JWG Collective, and the Rolling in the Dough Collective)**

344.   Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

345.   Plaintiff and the FLSA Collectives are or were non-exempt, hourly employees entitled to receive no less than minimum wage for all hours worked.

346.   Defendants impermissibly took a tip credit from the wages of Plaintiff and the FLSA Collectives.

347.   Plaintiff and the FLSA Collectives worked in dual jobs—one in a tipped capacity (delivery pizzas), and the other in a non-tipped capacity (working inside the store).

348.   Defendants were not permitted to pay Plaintiff and the FLSA Collectives minimum wage minus a tip credit for their hours they worked inside the JWG and Rolling in the Dough restaurants.

349.    Additionally, upon information and belief, the Rolling in the Dough Defendants did not provide Plaintiff and the Rolling in the Dough Collective with notice of the tip credit rules as required by 29 U.S.C. § 203(m).

350.    Neither the JWG Defendants nor the Rolling in the Dough Defendants provided proper notice of the tip credit provisions of the FLSA, because they failed to pay the wage rate they promised to pay.

351.    Defendants required and continue to require Plaintiff and the FLSA Collectives to pay for automobile expenses and other job-related expenses out of pocket, failed to reasonably calculate the value of said expenses, and failed to adequately reimburse Plaintiff and the FLSA Collectives for said expenses.

352.    Defendants took unlawful kickbacks from the wages of Plaintiff and the FLSA Collectives for uniform costs.

353.    The Rolling in the Dough Defendants took unlawful kickbacks from the wages of Plaintiff and the Rolling in the Dough Collective for contributions to the Domino's Partners Foundation.

354.    By the acts and conduct described above, Defendants willfully violated the provisions of the FLSA and disregarded the rights of Plaintiff and the FLSA Collectives.

355.    Plaintiff and the FLSA Collectives have been damaged by Defendants' willful failure to pay minimum wage as required by law.

356.    Further, individually, Plaintiff was not paid her last paycheck by the JWG Defendants.

357.     As a result of Defendants' violations, Plaintiff and the FLSA Collectives are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, liquidated damages, costs, and attorneys' fees.

### Count 2
### Failure to Pay Minimum Wages – Illinois Minimum Wage Law
### (On Behalf of Plaintiff, the JWG Class, and the Rolling in the Dough Class)

358.     Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

359.     Defendants paid Plaintiff and the Rule 23 Classes below minimum wage for the hours they worked by requiring them to cover automobile expenses and other job-related expenses, by taking illegal "kickbacks" from their wages, and by pay them a tipped wage rate while they worked in a non-tipped capacity.

360.     Plaintiff and the members of the Rule 23 Classes worked dual jobs—one in a tipped capacity, and another in a non-tipped capacity.

361.     Defendants paid Plaintiff and the Rule 23 Classes at minimum wage minus a tip credit for hours worked.

362.     Because Defendants required Plaintiff and the Rule 23 Classes to pay for automobile expenses and other job-related expenses out of pocket, Defendants failed pay Plaintiff and the Rule 23 Classes minimum wage.

363.     Because Defendants took deductions from the wages of the Plaintiff and the Rule 23 Classes for their benefit, Defendants failed to pay Plaintiff and the Rule 23 Classes minimum wage.

364.    By not paying Plaintiff and the Rule 23 Classes at least minimum wage for each hour worked, Defendants have violated the IMWL.

365.    Further, individually, Plaintiff was not paid her last paycheck by the JWG Defendants.

366.    As a result of Defendants' violations, Plaintiff and the Rule 23 Classes are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, unlawful deductions, statutory damages as defined by 820 ILCS 105/12(a), costs, and attorneys' fees.

**Count 3**
**Violation of the IWPCA – Unpaid Wages**
**(On Behalf of Plaintiff, the JWG Class, and the Rolling in the Dough Class)**

367.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

368.    This Count arises from Defendants' practice of failing to pay Plaintiff, the JWG Class, and the Rolling in the Dough Class at the wage rate agreed to by the parties.

369.    During the course of her employment with both the JWG and Rolling in the Dough Defendants, Plaintiff had an agreement within the meaning of the IWPCA to be compensated for all hours worked at an agreed upon rate.

370.    Other similarly situated employees likewise had an agreement within the meaning of the IWPCA to be compensated for all hours worked at an agreed upon rate.

371.    Defendants had a practice of not paying Plaintiff and the Rule 23 Classes at the rate agreed to by the parties. For example, Defendants took "kickbacks" from the wages of Plaintiff and the Rule 23 Classes, and failed to properly reimburse Plaintiff and the Rule 23 Classes for the expenses they incurred while making deliveries on Defendants' behalf. As a result

of Defendants' practices, the effective hourly pay rate of Plaintiff or the Rule 23 Classes fell below the rate Defendants agreed to pay them.

372.    Plaintiff and the Rule 23 Classes were entitled to be paid for all time worked at the rate agreed to by the parties.

373.    Defendants' practice of failing to pay Plaintiff and the Rule 23 Classes at the rate agreed to by the parties violated the IWPCA.

374.    Plaintiff, the JWG Class, and the Rolling in the Dough Class are entitled to recover all the unpaid wages in violation of the IWPCA made from their earned wages for a period of ten (10) years prior to the filing of this lawsuit. *See* 73 ILCS 5/13-206.

375.    Further, individually, Plaintiff was not paid her last paycheck by the JWG Defendants.

376.    As a result of Defendants' violations of the IWPCA, Plaintiff, the JWG Class, and the Rolling in the Dough Class, are entitled to unpaid wages, statutory damages provided under the IWPCA, reasonable attorneys' fees, and costs.

## <u>Count 4</u>
### Violation of the IWPCA – Unlawful Deductions
### (On Behalf of Plaintiff, the JWG Class, and the Rolling in the Dough Class)

377.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

378.    This Count arises from Defendants' practice of making unlawful deductions from the wages of Plaintiff, the JWG Class, and the Rolling in the Dough Class.

379. During the course of her employment with both the JWG and Rolling in the Dough Defendants, Plaintiff had an agreement within the meaning of the IWPCA to be compensated for all hours worked at an agreed upon rate.

380. Other similarly situated employees likewise had an agreement within the meaning of the IWPCA to be compensated for all hours worked at an agreed upon rate.

381. Defendants had a practice of making unlawful deductions from Plaintiff's earned wages without authorization from Plaintiff in writing as required by the IWPCA. Such deductions: (a) were not required by law; (b) were not to Plaintiff's benefit; (c) were not in response to a valid wage assignment or wage deduction order; and (d) were not made with the express written consent of Plaintiff, given freely at the time the deductions were made. As a result of these deductions, the Rule 23 Class members' effective hourly rate dropped below the hourly rate that Defendants agreed to pay them.

382. Defendants likewise had a practice of making unlawful deductions from members of the Rule 23 Classes without their authorization.

383. Defendants' practice of making unlawful deductions from the earned wages of Plaintiff and the Rule 23 Classes violated the IWPCA.

384. Plaintiff and the Rule 23 Classes are entitled to recover all the unlawful deductions made from their earned wages for a period of ten (10) years prior to the filing of this lawsuit. *See* 73 ILCS 5/13-206.

385. Further, individually, Plaintiff was not paid her last paycheck by the JWG Defendants.

386.    As a result of Defendants' violations of the IWPCA, Plaintiff, the JWG Class, and the Rolling in the Dough Class, are entitled to unpaid wages and unlawful deductions, statutory damages provided under the IWPCA, reasonable attorneys' fees, and costs.

**WHEREFORE**, Plaintiff Samantha Young prays for all of the following relief:

A.    Designation of this action as a collective action on behalf of the collective action members and prompt issuance of notice to all similarly-situated members of an opt-in class, apprising them of this action, permitting them to assert timely wage and hour claims in this action, and appointment of Plaintiff and their counsel to represent the collective action members.

B.    Unpaid minimum wages, reimbursement of expenses, unlawful deductions and an additional and equal amount as liquidated damages pursuant to the FLSA and supporting regulations;

C.    Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

D.    Designation of Plaintiff as representative of the Rule 23 Class and counsel of record as Class Counsel;

E.    A declaratory judgment that the practices complained of herein are unlawful under the IMWL and the IWPCA.

F.    An award of unpaid minimum wages, unreimbursed expenses, and unlawful deductions due under the IMWL and IWPCA.

G.    Statutory damages under the IMWL.

H.    Statutory damages under the IWPCA.

I.    An award of prejudgment and post-judgment interest.

J.      An award of costs and expenses of this action, together with reasonable attorneys'

fees and expert fees.

K.      Such other legal and equitable relief as the Court deems appropriate.


Respectfully submitted,

/s/ Michael Fradin
Michael Fradin (6289502)
The Law Office of Michael L. Fradin
8401 Crawford Ave. Ste. 104
Skokie, IL 60076
Phone: 847-644-3425
Fax: 847-673-1228
(*mike@fradinlaw.com*)

Andrew Biller (Lead Counsel)
(*pro hac vice forthcoming*)
Andrew Kimble
(*pro hac vice forthcoming*)
Markovits, Stock & DeMarco, LLC
3825 Edwards Road, Suite 650
513-651-3700 (Phone)
513-665-0219 (Fax)
(*abiller@msdlegal.com*)
(*akimble@msdlegal.com*)
www.msdlegal.com

*Counsel for Plaintiffs and the putative class*

## **JURY DEMAND**

Plaintiff hereby demands a jury trial by the maximum persons permitted by law on all issues herein triable to a jury.

/s/ Michael Fradin
Michael Fradin